We'll hear argument first this term in case number 1861-35, Collier v. Kansas. Ms. Schrupp. Mr. Chief Justice, and may it please the Court, for centuries criminal culpability has hinged on the capacity for moral judgment, to discern and to choose between right and wrong. The insane lack that capacity. This understanding of insanity has persisted since the 1500s and remains the Kansas scrubs moral capacity from its criminal law and runs afoul of the 14th and the 8th amendments. Kansas rewrites history in two ways. First, by elevating the wild beast test, one that was never used in this country and only rarely in England. And secondly, by conflating common law intent, which required a vicious will and was bound up in moral capacity with what it applies today, a morality-free modern mens rea. As such, Kansas uproots the deeply rooted by eliminating any mechanism to assess whether a defendant's capacity for moral judgment was intact or was irretrievably compromised by mental illness. Now I'd like to turn briefly to due process first and explain why the moral capacity notion is and always has been fundamental in our system. The model penal code is an excellent example. As criminal law evolved, the drafters moved to more precise mental states. When they did that, though, they retained the compelling mechanism to show insanity. We could do that, the drafters said, because we kept this, this narrow remnant of common law criminality. In Clark too, this court recognized both the presumption of sanity and that evidence of insanity trumps mens rea. This demonstrates the continued need for a mechanism to rebut the presumption of sanity, even when, even though a defendant harbors the requisite mental state. And it was not only the mechanism that was important in Clark, the substance was too. This court said Arizona could do that. It could eliminate the first part of the McNaughton test because it kept this, the right and wrong principle that subsumes it. So I'd like to now turn back to history, because it can be Before you do that, you are relying on due process. And suppose a State decides it wants to rethink the insanity defense. It looks to other nations for models. And one is what's known as a judgment of guilty but insane. That is, two determinants are made. Did the defendant do the act with which he is charged? That's the first question. And the second question is, what is the proper incapacitation? So guilty but insane would lead to incapacitation in a mental institution. Guilty and not insane would lead to incarceration in prison. Would such a scheme, if adopted by a State of the United States, violate due process? Yes, it would, Justice Ginsburg. And I think it would because the conviction itself carries collateral consequences, and we have never, as a country, treated the insane as culpable. And that conviction would impose collateral consequences on that insane person who really should be excused. But I would have thought you would want collateral consequences imposed, as I understood your submission, because the idea is that someone acquitted by reason of insanity would not go free, but would instead be committed to mental care. Yes, that's right, Your Honor. But Well, why wouldn't that, if that's the consequence of the system Justice Ginsburg was talking about, guilty but insane, I don't understand why that's not exactly the sort of course you're looking for. Well, I want to rewind a little bit, Your Honor, because really what we're talking about is the mechanism to be able to show that you lack moral capacity. The back end of it, as long as you have the mechanism to show that you lack moral capacity, that you can choose right from wrong or can't do that, then the ultimate result is not all that determinative. If guilty but insane means that you – if you end up in exactly the same place, then I suppose the label doesn't matter. But what I'm nervous about, actually, is if you have a guilty but insane, some of those statutes in some jurisdictions are you're guilty, you go and get treatment, and then once you are well. But my hypothetical is the question of where the person is incarcerated is determined by the fact that, first and second, it has no collateral consequences. You're found to have committed the conduct charge, but because you are insane, you go to a mental institution. So we take out any kind of collateral consequences that would label you on the criminal side. It's just you have committed the deed that you were charged with, but you were insane, therefore you go to a mental institution. That, you think, would violate your process? Well, Your Honor, I – you know, to the extent – so I guess I would go back to history on this. And what we know is that these people were not even subject to prosecution at all. Hawkins, in his plea to the Crown, said so. But as long – the mechanism – as long as the mechanism for the defendant to present his lack of moral capability at the back end, if the regime protects him in that way – but I also disagree, Your Honor, that the conviction doesn't stigmatize or show that he is guilty. I mean, if you're found guilty, you have that conviction. I do think that the insane need mental treatment. They need commitment. So I guess I'm not – unless I'm missing your point, I believe it's more about the mechanism and not allowing a conviction of an insane person. You're talking about lack of moral capacity. Would it be unconstitutional if a State said that a person is sane if the person knows that the act is illegal, even if the person thinks that the act is moral? So the right and wrong principle, Your Honor, includes both knowledge of legal wrong and knowledge of moral wrong. There's very little light between the two. Well, I don't know that that's the case. Someone can know that something is illegal but feel very strongly that it is moral. So what's the answer to my question? Justice Alito, it's not about a belief. It's about a capacity fueled by mental illness. So if a person justifies or believes that they are justified in acting in that way, they're not covered by this baseline standard. What's the answer? If the person has the capacity to know that what he did was a violation of the criminal law, and that's the defense that is provided by a State, is that unconstitutional? No. So long as it encompasses — it can't just be that you are — that you forget what criminal law is. What Justice Breyer said in the dissent from the denial of cert indeling was that what legally wrong means — and it still falls within the right and wrong principle — what legally wrong means is that you are unable to comprehend the actual nature of the act, such that you believe, for example, that you're falling into a defense. Well, there are many, many people who believe — maybe not so much for murder, but certainly for a lot of other offenses — that things that are violations of the law are nevertheless moral. And so if that were the general rule in criminal law, that you cannot be convicted if you know that — if you believe that what you've done is moral, that would revolutionize criminal law. And the only element that you are adding to that is that this is caused by a mental disorder. So it becomes important to understand what you mean by mental disorder and what do you mean by a mental disorder. Do you mean everything that is listed as a mental disorder in the latest edition of the DSM? Your Honor, it's not about the diagnosis. And you asked what mental capacity means and what mental illness means. I can put it this way. It is as if a person — again, it's not about a belief. It's not about justifying. It's about you actually can't tap in to the part of your brain that allows you to choose right versus wrong. And juries have, in 48 jurisdictions, been able to make this distinction, regardless of what the diagnosis is. What is the answer to my question? Is it sufficient if the person has something that is considered to be a mental disorder in the DSM? And it's been calculated that one in five people in the United States has some mental disorder. So we're talking about 60 plus — 60 million plus people. All of them can go to the jury on the question of whether they had the capacity to know that what they were doing when they committed the crime was morally wrong. Justice Alito, they should be given the opportunity to at least try. This shouldn't be legislatively cut off at the knees. There are many mechanisms in place in our trial system, many hoops that they would have to jump through. But if they have a mental disease that's diagnosed, then they should at least be able to get in the door and get evaluated and then proceed. Ms. Rupp, can I ask you about a premise of your argument? And it's that if we look to the criminal justice system, there are many ways in which criminal culpability can change over the years. And how do we figure out which are the ones that the Constitution requires stay the same now as they were back in the common law or back at the founding or back in 1868, depending on which date you're using, and which ones can change? What do we do? We're not stuck with all of history, are we? So if we're not stuck with all of history, why are we obligated to keep this part of it? Well, Your Honor, because that's the test that this Court has set out for due process. And you can go back as far as you want, but by the 1500s, we know that this was an intact principle. Well, I mean, the test that was set out by this Court for due process, I mean, I could give you some ways in which the criminal law of olden times seems remarkably archaic to us now, marital rape exception, maybe sodomy laws. I'm sure that there are others that I could list. You know, what does due process require we hang on to, notwithstanding changing times? And I guess what does criminal not – what does the due process clause require that we hang on to, notwithstanding the judgments of some states that the time for this has come and gone? Well, we actually have sort of a perfect confluence, Justice Kagan, because we have not only the history that goes back maybe a thousand years and certainly since the mid-1500s, but we also have the modern practice, a fundamental – a rule of fundamental fairness currently in operation in 48 of 53 U.S. jurisdictions. So it's not just the history. It's the fact that we look, and everyone has retained it, or nearly everyone has retained it. With respect to history, can we take into account the reality that in the old days at common law, the result of the insanity defense would be you were sent to prison to bedlam, where the conditions were often far worse than in prison? So someone might decide, no, I'm not going to plead insanity, because then I'll end up with an incarceration worse than prison. Do we take that into account in deciding the function of the insanity defense? I don't think you need to take it into account. I think what the fundamental principle is, is that the good and evil principle, or the right and wrong principle, as applied to the insane, it's the application to the insane that has – is deeply rooted in our country. And where those people – I mean, in today's time, those people wouldn't be sent there, right? We know, after Fauci, that this – those people are sent to an institution. So, no, I don't think it's how they were historically where they ended up. They ended up in a lot of places, Justice Ginsburg. Sometimes they ended up there. Sometimes they were released to their families. The things that I think is underlying a lot of the debate is the expansive notion of what counts as evidence. In your brief, you say the defendant in this case was – this is evidence to support his insanity claim – was described by some as a tightwad who would, for example, borrow rather than purchase tools. And in the same page – again, this is evidence that you selected to put in your brief of his mental disorder – that he thrived on self-importance, community prestige, and being perceived as having an ideal or perfect marriage. Now, maybe that's not the best way to order your life, but if that's what you mean by insanity, you can understand why that Your Honor, Mr. Chief Justice, let me just tell you why those facts are in there and why they're not – why they're there, and that will shed light on it. What we know is that Mr. Kaler had a major depressive disorder. He had a qualifying mental illness. Those facts are in there to show that there was an entire other category of evidence that, in combination with that major depressive disorder, could have been developed. But it doesn't – But he borrows tools instead of purchasing them? That sounds like the reasonable option. Well, you can't – Mr. Chief Justice, you can't take that one fact out of context. But the most important thing is, is that juries are able to take the collection of evidence and – that is presented to them and decide – they decide whether the person is insane, whether they have the capacity for moral judgment or not. Now, what would be put before the jury? That is, what – now, what evidence in this record to show that Kaler was unable to tell right from wrong? What evidence is there that he was unable to make that distinction? On the current record, which of course was not developed with a right and wrong principle, I would point you to the Joint Appendix of 87, where his expert said that he – he couldn't rule out short-term disassociation. If you are offline in that way, he couldn't appreciate right versus wrong. But again, I'd like to point out that he was – he was not even given the opportunity to put forth that and to develop other evidence that would have shown more forcefully that he didn't. And that's the same for every defendant. He had the opportunity and every incentive to do that at the penalty phase. At the penalty phase, he was able to – to argue, I shouldn't get a death sentence because I didn't know that what I was doing was morally wrong. And you'd think that if the jury believed that, they wouldn't have imposed the death penalty. But they did. We have to keep in mind what he did. This is an intelligent man, and he sneaked up on the house where his wife and her mother and his children were staying. He killed his ex-wife. He killed his ex – her mother. He executed his two teenage daughters. One of them is heard on the tape crying. He nevertheless shot her to death. He spared the son because he didn't think the son was siding with the mother. And then he ran away and turned himself in the next day. Now, this is the stuff from which you're going to make a defense he didn't know that what he was doing was morally wrong, much less he didn't know what he was doing was legally wrong. Justice Alito, I'll answer the first part. Sentencing is not a substitute because we know from the briefs that jurors make up their mind at the guilt phase. And, in fact, the sentencing justice in the opinion below said we should not let what happens at guilt indicate what happens at sentencing. And because he lacked that, the jury lacked that lens to consider the moral capacity principle, you can't draw any – it would be speculative to say what the capital jury would have decided. It's not realistic. I'm in a jury, and I say, well, now I've convicted this guy. I found him guilty. Having done that, even though I think that he didn't know that what he was doing was morally wrong, I'm going to vote to impose the death penalty. Is that realistic? It is realistic because we know from the briefs that they – that jurors are swayed by what they decide at the guilt phase. And if they have lacked the mechanism and the opportunity to look through the lens of capacity for moral judgment, then – then we can't draw any conclusions about that. Now, the facts are hard in every case, and they are hard in this case. But what we're talking about is an opportunity, a mechanism for all defendants to be able to get into the threshold and let a jury decide. You've referred several times to the jury, and one of the debates that has occurred over the last several decades is the capacity of juries to be able to parse these fine concepts. And one of the things that leading scholars have said is that this may be beyond the capacity of jurors to do in a principled way. So why can't a state say, as Justice Alito points out, we're going to take this away from the jury as a separate defense, put it into mens rea, and then, as Justice Ginsburg points out, have it considered at sentencing? Why is that an unreasonable policy judgment, so unreasonable as to violate due process? Well, two points, Justice Kavanaugh. First of all, the critiques or the debates were not about abolition. They were not about scrapping the defense entirely. Those should be handled through instructional or evidentiary mechanisms. Sorry to interrupt, but I think one of the debates was, in fact, about putting it into a mens rea defense, as Kansas has done, in part because the concept as a separate defense was too confusing for jurors. Professor Goldstein pointed that out in his book, and that has been part of the debate. So they haven't necessarily abolished the insanity defense. I think that's a bit of a misnomer. They've funneled it into mens rea and then said that it can be considered at sentencing as well. Justice Kavanaugh, they have abolished. I mean, they've acknowledged that they've abolished. And what is present in the mens rea approach is nothing more than what Winship requires, and we know that it is not sufficient because it doesn't allow, it doesn't allow a jury or the defendant to raise his capacity for moral judgment, which, if you go back through history, was an important component of criminal culpability. Ms. Shrupp, do you have any information about how this works in the 46 States that have the rule that you prefer? In other words, how often do people raise insanity defenses? How often do juries actually find insanity? If this were in one of the other 46 States, how would it operate? Or not if this case was. I mean, honestly, you can't say this, but I can. In none of these 46 States, I'm guessing, would your client be found insane. But what happens in these 46 States? How often are people found insane? So, Justice Kagan, it's not in the record. I have done some research. I could let you know what I found out if you'd like me to. It's not contained in the record, but I do know that it is raised in the right and wrong States and that there are acquittals every year. And, Counsel, can I just add one other question about the extent of how far this goes? Obviously, this is a capital case. But how far down the road would you say this defense must be extended as a matter of due process to all homicides, to all felonies? Where do you think the line would be drawn? I don't think that you draw the line, Justice Gorsuch, at punishment. So an insanity defense is required with respect to any criminal complaint, even a regulatory strict liability misdemeanor? This Court has never – well, so it's our position. We're making a facial tone. So it's our position that it should be applied everywhere. Okay. But this Court has never definitively ruled on the extent of strict liability crimes. I think it could carve that out. But I think what's important are two things, Justice Gorsuch. First of all, this is a rarely used defense. It's invoked in less than 1 percent of the cases and successful in only a quarter of that. We're not talking about a huge number of people. But for the people that it really matters, there is no mechanism in these States to protect them, to let them be excused or to let a jury consider their actual culpability when they can't tap into their brains in the way other people's people can. And I think jurors are able to decide that. They decide the term reasonableness all the time. If a State adopted the irresistible impulse defense, would that be unconstitutional? This Court in Leland said that it is not a constitutional floor, so no. No. Not whether it's required. But would that be unconstitutional, because it does not ask whether the person knew right from wrong? I think, yes. It would also have to include the right and wrong principle. I'd like to turn briefly to the Eighth Amendment. The original public meaning of that term was that it would be cruel and unusual to punish the insane. In 1868, with the Reconstruction, amendments were adopted. Every single jurisdiction had an insanity defense. And even if you rewind back to 1791, it would have been cruel and unusual to punish the insane. They were either handled outside of the legal process or they were allowed to come in and plead and prove insanity. Because the Eighth Amendment was intended as a check on sovereign power, States are simply not free to legislatively redefine culpability in a way that is inconsistent with history and longstanding practice. But that is what Kansas has done here. It is an outlier. It prevents people from – well, by taking away the mechanism, they ensure that insane people will be punished in their borders. Ginsburg. Kansas Supreme Court didn't reach that question, so you are asking to – us to decide it as a matter of first impression. No, Justice Ginsburg. And this, you know, this was vetted at the cert stage, and I would point this Court to the addendum at our cert reply at page 18 and 19. Because there it's clear that this notion of applying wrongfulness to the insanity defense came up at oral argument, was argued, and in that post-argument memo, counsel said, we believe that this issue is presented. We're going to – if you want supplemental briefing, we'll provide it. But we believe it is an issue that is implicit in this Court's ruling. What do you do with the statement of Justice Marshall for plurality in Powell v. Texas? Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity defense – or insanity test in constitutional terms, end quote. I think pointing out the difficulty of us, through the Due Process Clause, wading into this policy debate and figuring out what the line is. Justice Kavanaugh, that in Powell was not an abolition case, first of all. But secondly, what Justice Powell said there was a reflection of the facts of that case. That case had to grapple with Leland, and the only mechanism or the only test that would have applied in Powell is an irresistible or compulsion-based test. So our standard, the right and wrong standard, is below that. And it's not a test. But Leland, in turn, said – noted the wide disagreement among different tests and said choice of a test involves not only scientific knowledge but questions of basic policy. The whole problem has evoked wide disagreement among those who have studied it, which is true as to this – as to the Kansas approach as well. There's wide disagreement, but some have advocated for that as well. Well, Leland also recognized that the right and wrong principle was the majority test in the majority of jurisdictions. And that holds true today because 48 jurisdictions have retained this baseline principle. And we're not – Are all 48 constitutional? If they have the right and wrong principle, they are, yes. Is that a yes? Yes. I'm sorry. All 48 are constitutional? Yes. Justice Marshall's – Justice Marshall's statement in Powell was not limited in the way that you suggest. It was categorical. And he was joined by Chief Justice Warren, Justice Black, and Justice Harlan in saying that. So they were all wrong at that time. Mr. Chief Justice. Briefly. Okay. Justice Alito, it's not that they were wrong. It's just they were talking about a different scenario, a non-abolition case dealing with a test that is north of our standard. Thank you. Thank you, counsel. Mr. Krauss. Mr. Chief Justice, and may it please the Court. Petitioner asked this Court to define a rule of insanity and to require the States to implement that rule in its criminal justice proceedings. But as this Court indicated in Powell nearly 50 years ago, nothing would be less fruitful than for this Court to select a rigid rule of constitutional law of insanity. And that admonition rings as true today as it did 50 years ago. The first thing I'd like to talk about is that it's not deeply rooted. The right versus wrong test is a relatively recent vintage. The historical basis for it started somewhere around the 1800s and, therefore, is not deeply rooted. In addition, the States have had historical and traditional discretion to both define the elements of the criminal law, the defenses that are available in those defenses and elements are met. And consistent with that discretion, the State of Kansas has a holistic approach to the mental illness problem, starting at the time the criminal justice proceeding is initiated, throughout the guilt phase, as well as in the punishment phase, and continuing on even with regard to the sentence as it's carried out, whether being in a prison or in a mental hospital. These factors confirm that Petitioner has not carried the heavy burden to identify a single rule that is clearly established and required by the fundamental elements of due process. And for that reason, we believe that the State Supreme Court judgment in Kansas should be affirmed. And so unless there are additional questions this Court would have, I'd like to first turn to the answer of Justice Alito's question. And the answer is the right and wrong test has multiple components. There is no consistent element or definition of how that's applied in any of the 46 jurisdictions. As our brief points out, there are a host of different factions and different ways in which those elements would be met. And we think that in and of itself undermines the constitutional floor that Petitioner seeks to have. Sotomayor, I understand what you're saying, but I have a problem, because as I understand the mens rea test, it takes away excusing a person who from the 1500s, 1400s, would have been considered a lunatic, a person who hears voices, and the voices tell him or her what to do, and they have no volition to fight back. They, many of them, know they're killing somebody. So intent under your mens rea test is met. They absolutely know they're killing someone, they just have no ability to say no. They don't, they can't because of their either mental lunacy. All of the wild beast things, all of, yes, they have two components, some volition and some not, but for centuries, that concept of no volition, the true lunatic, would get off. Your test doesn't do that. Well, it does. So our test is relatively consistent with the cognitive capacity test. There's a volitional, there's a moral test, and then there's the product test. And so we would view our test as consistent with the cognitive test, and if the individual can't formulate the criminal intent in Kansas, that is a sufficient defense, and that has been ---- But that's not how I read your charge. I mean, when I read the charge here, it doesn't talk, you're talking the very language that your adversary is suggesting you should adopt, but it's not part of the mens rea test. The strict mens rea test now is, do you intend to, do you know what you're doing? Do you have criminal intent? That's right. No, no. There's no, yes, you're adding a volition, but what I'm saying is you're, this test standing alone doesn't do that. So as I understand Petitioner's test is they want to ask the question of whether or not the individual knows that it's either legally or morally right versus wrong. What Kansas does is if you have criminal intent, you are responsible. But after conviction, then you have the opportunity to assert a right versus wrong test. Well, but that's the point, which is that issue, which is after conviction. What she's been arguing is that since the beginning of time, both under English law and at the time of the founding, all the states then, and frankly until I think the 1970s, all 50 states, didn't make it a subject of sentencing. They made it a reason for why you should be excused from your conduct, for your conduct. You're saying the same thing with something like duress. I intend to kill someone, but it's because somebody's holding a gun to my head. All 50 states would let you off. But you're now saying it's okay to stigmatize you with a criminal conviction, even though in fact you may be insane. I'm saying what the state of Kansas has done is it's defined its mental illness defense consistent with what the historical teachings are, dating back to Blackstone, going all the way up to the 1910. I believe it was Dean Norval Morris indicated that up until the 19th century, that being monotonous, criminal intent was what handled everything with regard to criminal insanity. So, General Krauss, could you assume for a moment that I disagree with you on the reading of the historical record? And just let's say that the historical record actually, that there's much more evidence than you're suggesting, that a defendant had to have a guilty mind, meaning an understanding that what he was doing was immoral, as well as the inability to form specific criminal intent. And if that's the case, if you look at all the cases and say, you know, case after case after case, what they're talking about is something more than criminal intent. What they're talking about is some kind of moral understanding. If that's the case, what's your best argument that you should win? So I think I have three. The first one is the existence of strict liability. The second would be the existence of corporate liability. And third, I think there's just the general understanding that criminal intent has always been separated from moral capacity. And even with regard to, I think, the hypothetical you've suggested, I think we would have to know whether or not the right versus wrong test is being defined in a legal sense or a moral sense. And even if so, the States that have adopted the right versus wrong test have variations within them. Some, for example, like the Federal Government, to my understanding, would require a severe mental illness. Kagan. You know, I guess I understand that there are some variations in the historical record and even in States now. But there are some number of States, a great number, 46 States, 48 States, whatever it is, that go further than you do in terms of saying something more is required than the mere capacity to formulate criminal intent, and that that's something more in large measure is some ability to make moral judgments and to distinguish between right and wrong. And, again, let's just assume that that's what the historical record said. I know you don't agree with that. But let's assume that that's what the historical record indicated. Could you still win, and why? I could because of the nature of this Court's inquiry. This Court has to — I'm sorry, Petitioner has to satisfy a high burden to identify a particular rule that the absence of which Kansas law would constitute a violation of a deeply rooted rule, and that simply doesn't exist based upon the very generalities that we've talked about today. Roberts. It seems that by its nature, if the principle is, as Justice Kagan suggests, hypothetically, if it's historically established that you cannot punish people who don't know the difference between right and wrong, that certainly sounds like something that is rooted in the conscience and it would be ranked as fundamental. Well, I think what the — and I don't mean to fight the hypothetical here, but my understanding of the history is that what has been dealt with throughout our time is how to resolve and handle mental illness within the criminal capability system. And what this Court's decision, Arizona v. Clark, said is that there is no fundamental principle. I'm not going to get it exactly. I mean, it is a nightmare trying to figure out exact standards. I agree with that. But my question, which I just hope you would clarify because it's — I'm stumbling on it. Imagine two defendants. Both defendants, one and two, are certified by whatever board of psychiatrists you want as totally insane. All right? The first defendant shoots and kills Smith. The second defendant shoots and kills Jones. The first defendant thinks that Smith is a dog. The second defendant knows it's a person but thinks the dog told him to do it. Okay? What's the difference? So I think that's — the difference is criminal intent in the first situation because, as I understand the hypothetical, the individual intends to commit a crime against a human being. No, I know these are words. You see, I wanted — looking for something in terms of criminal law or legal purpose or human purpose or whatever that would treat the two. Why treat them differently? One answer you've given. You said it's so hard to figure out. I agree it's hard to get a definition. That's going to be true in both cases. You say criminal corporate, criminal liability, and regulatory offenses. I agree with you. You'd have to carve out exceptions, and that is not easy to do. Okay? I've got those points, but I'm looking for something different between the two defendants. The dog, there he is. The dog, he told me to do it. They're both crazy. And why does Kansas say one is guilty, the other is not guilty? So I think that this Court's cases have historically allowed legislative bodies — Breyer, I don't care what the cases say at this moment. I've read cases. My law clerk has found 40 instances, going back to Bracton, you know, where it seems to be against you. But I'm not interested in that. I'm interested in a practical, pragmatic purpose in why the law should treat those two cases differently. Same question. I've just now repeated it three times. And I am listening for your answer. And I apologize for not getting to the answer of your question. I think the problem is that States have grappled with this, and they've made different moral judgments as to who is morally responsible or not. And this Court's cases allow the State legislatures or Federal Congress to determine whether that person should be or should not be held responsible. What Kansas does is it identifies those who intend to commit a crime, punishes those. You are telling me that States, and you're right, particularly Kansas, do, in fact, treat, he's a dog, the dog told me to do it, differently. But my question was, why? Well, I think it's a spectrum as to what the States believe is appropriate. In Delaware, for example, my understanding is that individual would not be convicted, whereas in Illinois that person could be convicted because they know that shooting a human being is legally wrong. Do you think, General Kraus, that you could also eliminate consideration of the moral understanding at sentencing? In other words, take the Justice Breyer example, and the dog told me to do it. Would it be unconstitutional if your State did not have a procedure for considering that at sentencing? So, obviously, different question, and I think it also engenders a different test. I think that, if you're considering what is available at the sentencing for whether it violates the Constitution, would implicate the Eighth Amendment. Well, let's put the Eighth Amendment to the side. Let's say that this isn't a capital case, all right? Does the State just have to have a way to consider at sentencing somebody's complete lack of understanding of the morality of his actions? I don't believe that this Court's cases would indicate that the States have to consider the morality at sentencing or any particular time. How about the mens rea aspect of that? I just want to follow up on Justice Breyer's question as well. And, Justice Kagan, would you accept that at least that is required as a matter of due process, that some inquiry into mens rea is required in these cases? And if so, why? And if not, why? Yes, I would accept that carving out strict liability in the corporate liability context. Why? And how do you reconcile that with our strict liability cases? Well, I think what this Court has done is historically guarded mens rea because that's what separates innocent conduct from criminal conduct. And that's what Kansas has done here. So you accept that there is a constitutional minimum floor below which the States cannot proceed with respect to mental capacity and insanity. You just suggest that you've met that standard. Is that the nub of the argument, then? I think I would finally parse that a little bit. I would admit that there is a mens rea requirement with regard to how one would define insanity. I don't believe that this Court has identified a floor and suggested that there are variations of ways to handle it. I'm not sure I understand. You accept that States could define strict liability crimes. I don't know if you've answered Justice Gorsuch's question, which is could you do away with the mens rea defense? Could you simply say we in Kansas believe if you kill someone, regardless of the reasons, if you've done the act, you've committed murder. Period. End of story. No mens rea defense, no nothing. Again, I think that is a much more difficult situation, and I think that would present a lot of additional problems for the State of Kansas because of this Court's requirement of having a mens rea baseline. Could you get rid of other defenses, General Krauss? Could you get rid of other defenses, you know, duress? Could you get rid of the duress defense? Yes. So I think the same historical analysis that we have undergone with regard to the individual research on duress. I mean, you're being very reticent about answering these questions. Has there ever been, can you cite any State or any legal system, I'll even just limit it to English-speaking countries that have ever said that killing another person is a strict liability offense? No, and Kansas certainly doesn't do that. On the history that Justice Kagan was asking about, I think your primary answer was that there's been no particular test that is historically rooted. But isn't there a baseline that is historically rooted, above which there have been a variety of tests that have been accepted by the states until, as Justice Sotomayor said, until the end of the 20th century? I think I would agree that the states have, or organized societies have consistently struggled with how to define and handle mental illness. But I don't believe that there has been a baseline that has been established beneath which the states could go. Well, since the early 1800s, at least to the late 20th century in the United States, didn't every state allow some form of a separate insanity defense at the guilt phase? My understanding is that the treatment of insanity has varied within particular parameters. For example, some states would require an affirmative defense. Kansas, for example, didn't have a separate defense. But all separate? Let me just focus on my question. All the states had something separate from the mens rea approach at the guilt phase through the end of the 20th century. Isn't that correct as a matter of historical practice? You can still win the case, as Justice Kagan noted, but just to make sure we're on the same page. Yeah, and I'm not trying to skip the answer because I think Kansas actually included it as part of the guilt phase. It didn't have a separate insanity defense. So, for example, it came in with a different definition. You're saying that all states had a separate insanity defense in 1791? I don't believe I was saying that they have separate defenses. I think they handled it differently. Some of them defined it as an affirmative defense. Some of them put it in a separate proceeding. Some of them handled it through mens rea, did they not? They have. Does mens rea for murder or for any other criminal defense vary from case to case? Is it not the same in every case, regardless of whether the person claims to be mentally ill or not? The mens rea element would be consistent in an attempt to commit a crime, yes. So if the mens rea element traditionally incorporated a requirement of moral culpability, that would apply across the board, would it not? Not just the cases where the person says, I have this lack of capacity due to mental illness, but I have it due to political brainwashing or religious fanaticism or any other reason. That's correct, Justice. Was that the traditional understanding of mens rea? So I don't believe that was consistent with the historical understanding of mens rea, and I think it's also inconsistent with general criminal principles in which we don't look at the motive of the individual committing the crime. Would you agree that historically, if you go back and you look at the cases, you see this operating in two categories of cases. One is for insane people, and one is for what were then called idiots, right, people who lacked mental capacity. So, I mean, but for those people, it came up again and again that, yes, you know, you lack the moral capacity to understand what you're doing, and therefore, the criminal system ought to operate differently on you. Isn't that right? So I would push back only in regard to whether or not it was a moral capability. I think, historically, it's looked at a cognitive capability as to whether we can take intent to commit a crime. And I don't think that the moral capacity came in until the monotone era as to we asked whether or not someone knew it was right and wrong to commit a crime. But he certainly phrases that. I mean, it's quite deep, this question. It's like ethics of Aristotle. The wind blew my hand. You don't hold him? Well, I'll save my death for later. I'm not sure I want to. Thank you, counsel. Thank you. Ms. Prilligar. Mr. Chief Justice, and may it please the Court. Petitioner bears the burden of establishing that substantive due process principles override the Kansas legislature's judgment in this case in adopting a mens rea test of insanity, and he has not carried that burden. Petitioner suggests that this Court should recognize a theory of moral culpability and impose that uniformly across the states. But the problem with that approach is both as a matter of history and in contemporary practice, there has been no agreement on the precise circumstances when mental illness should excuse criminal responsibility. And I'd like to begin, actually, with the hypotheticals that Justice Sotomayor and Justice Breyer brought up, because I think that this actually illustrates that even in contemporary jurisdictions today, there is a basic divide on when someone should be entitled to invoke the insanity defense. And this gets to the difference between legal wrong and moral wrong. Even in those jurisdictions that adopt a wrongfulness test, the one the petitioner is proposing, there is differential treatment of defendants based on whether they could appreciate that their conduct violated the law and constituted a crime or not. So imagine the defendant who hears voices that command him to kill in order to save the human race. He knows that murder is a crime and that he'd be violating the law, but he thinks the action is morally justified because of his mental illness. In a substantial number of jurisdictions, he would not be entitled to invoke the insanity defense. And so to try to recognize or articulate a theory of moral culpability, I think, has no roots in history and would actually raise the possibility of challenging State laws across the nation. Sotomayor. Excuse me. We have – every State has a direct defense. They all vary. They all have different exceptions. They all have different articulations. There's never been a common one. But all 50 have them. And the essence of it is defined very simply as duress, compulsion. And we give wide, wide, incredible latitude to the States to define those circumstances. I think what your adversary is saying is that making this go simply to intent and taking out some differentiation from the true lunatic who knows it's wrong to kill a person, but the TV made him do it. No volition whatsoever to conform his conduct to the law. No ability. I think it's more moral incapacity rather than capacity. The intent-based defenses don't encompass that in any way. This is not like Clark where we found that the two prongs of the McNaughton test were really encompassed in the first. That's what the problem is for me. There is an essence, just as there is an essence of compulsion for duress as a defense mechanism, there is some minor amount that has to excuse criminal liability. And, Justice Sotomayor, Kansas here has recognized cognitive incapacity as the way that you excuse criminal responsibility when you're assessing these difficult issues of how mental illness should function to excuse criminal culpability in a criminal justice system. But that's where we differ. Because you can know something is against the law and still not have the ability to conform your conduct. If I make a moral choice, I could say, if it's only a moral choice, I could say, I don't wish to do it because of my morality. Could I physically stop myself? Yes. Someone who is insane can't even physically stop themselves. And that's a different sort of. I absolutely agree. It's a different test of insanity. As this Court has recognized, jurisdictions have struggled with this across time and across different places, and they've settled on different variants in trying to identify the precise circumstances which should hold someone totally outside the realm of criminal responsibility. Ms. Freelager, what you're suggesting is a test for insanity is not a test for insanity. It's just the usual intent requirement that we apply to all defendants. If the defendant doesn't have the intent to kill, then the defendant is not culpable for that act. And it has nothing to do with his insanity or not. And I think that the question Justice Sotomayor is asking is, is there something else that's necessary? And we would leave a lot of flexibility to the States, but that something else is something that relates particularly to insane defendants, to their ability to say, because I have a mental illness, there has to be something more. So I don't think that there's something else here. And as this Court has recognized, the guidepost is history. What Petitioner needs to do is come forward with some kind of historical consensus establishing that there's a fundamental principle that Kansas' mens rea approach is violating. And actually, the mens rea approach is itself one that was linked to the common law early articulations of insanity. It was long understood that one of the ways you might try to identify that class of individuals who should be declared legally insane as a legal concept was to look at those who didn't have capacity to form criminal intent. And I want to pause for a moment. Kagan. Kagan. Let's just say I disagree with this, that when I look back at the history, I see lots of cases, Rex v. Arnold, Billingham, a number of others, which make it quite clear, I mean, these are all people who had an intent to kill. And what the common law was saying was that even though they had the intent to kill, there was going to be a further inquiry into how their insanity limited their moral understanding, their understanding of wrongfulness of their act. So if I think that that's kind of all over the history, how do I find for you? Well, I want to make clear that even if you thought this was a novel approach that didn't have roots in history, the Court has many times recognized that outlier States aren't necessarily violating substantive due process. Leland v. Oregon, for example, was a case where Oregon was the only State in the nation that required defendants to prove their insanity beyond a reasonable doubt. So I don't think that that's cause alone to think that somehow this is violating a fundamental principle. And I think actually looking at the jury instructions in some of the cases that you mentioned, Justice Kagan, like Rex v. Arnold, the jury was instructed there that the defendant had to be shown to have no understanding or memory such that he could form no intent whatsoever. That is a restrictive test of insanity. It's focused on this same idea of cognitive incapacity. Kagan. It's less helpful to me to go over each case one by one than for you to tell me that if, you know, if, what I think is true is that the history, there's just a ton that suggests that there was something more than a requirement that the defendant have be able to form an intent to kill. Does Ms. Schrupp then win? I don't think so, because Petitioner still bears the burden of trying to articulate with precision what that something more is. And I think for this case. You can, you can. I mean, that was the point of my question. I think the law has many, many ways of, in different circumstances, trying to separate out individuals for whom the criminal justice system is just not going to work in terms of preventing, et cetera, the crimes. One, the wind blew my arm. Okay? Two, duress. Because in a duress case, you're looking to see could the defendant have done otherwise. With insanity, you're close to that. Often, it's a question of could the defendant have done otherwise. And even where not, it is, is this individual so different from an ordinary individual that it just doesn't make sense to apply the law. Now, if something like that is going on, then my question, if in fact, he's the dog, out, why isn't it? The dog told me to do it. Now, that's the fourth time I've asked that. But I would like to know what you think about it. So these are obviously difficult questions, Justice Breyer. They're ones that societies have wrestled with for centuries in trying to balance the medical and moral and legal judgments that go into crafting an insanity rule. This Court has long recognized that States have principal responsibility to do that, and I think that there are various ways States could decide that they might be a more readily observable sign of mental illness and less likely to lead to confusion about what was actually in the defendant's mind and whether he was considering right versus wrong. A jurisdiction might also think that looking at considerations of individual culpability, they don't want an on-off switch for criminal responsibility, but rather want to shift those considerations to the sentencing stage, where a judge  more nuanced determination of individual culpability. Ultimately, I think that these ---- Sotomayor, I would say consistent with Apprendi. Assuming we find that since the beginning of modern thought, that there is an irreducible minimum of due process that requires the insane to be not convicted by a judge or put in a mental institution by a judge, but by a jury. May I answer, Mr. Chief Justice? Yes. There would still be a question, Justice Sotomayor, of how you define who is the insane. That's a legal concept. It's one that's yielded no single formulation, and I think for this Court to try to articulate a theory of moral culpability could throw into question State laws across the nation that are trying to make these difficult judgments. Thank you, counsel. Ms. Schrupp, you have five minutes remaining. Thank you, Mr. Chief Justice. I'd like to make three quick points. First, the problem with the mens rea approach, to get to Justice Breyer and Sotomayor's point, is that it scrapes out the why, the underlying motivation fueled by mental illness that explains a defendant's act, and that has been a part of our history for centuries. And that gets to the dog or the dog example. It's completely arbitrary. I don't know why if you think why one defendant who thinks that a dog, he's shooting a dog, versus another one who thinks a dog is ordering him to shoot someone else, makes any difference whatsoever. The first person is acquitted and let out on the streets, and the second is put in jail and maybe put to death. The second piece of this, and so there's no safety net, basically. What Kansas does actually is even more extreme, because it limits the kind of mental illness evidence that can come in, and it is essentially advocating. It never explains why or whether there is any light between the wild beast test and the McNaughton 1 test, but either way, it is fundamentally different than what we have had historically and what 48 jurisdictions retain. Second, I'd like to turn to my friend on the other side's notion that there are some limits. He actually doesn't suggest anything, and if you look at page 39 and 40 of their brief, basically everything is up for grabs. There can be no mens rea. They can make everything strict liability. Duress, self-defense, all of these defenses are on the line because according to them, all that's required in Kansas is a voluntary act and intentionality. And finally, turning back to history, it's just not right to say that the right and wrong principle is a 19th century invention. There is a wall of cases and authorities starting in the 1500s and continuing uninterrupted all the way through until 1843 when McNaughton was formed. There's literally scores of cases here and in England applying the right and wrong principle. To contrast that with the test that they suggest, which is essentially the wild beast test, that was invoked maybe two or three times. It was a blip. So history favors us, and although due process is a rigorous burden for a Petitioner to meet, we're satisfied here because they have taken something out of our fundamental criminal culpability, what we believe as a country. They have scraped it out, and they are punishing the insane as a result. If this Court has no further questions, we would ask you to please reverse to Kansas. I'd like to ask you a question if you've finished the comments that you want to make. In your reply brief, you say that the State's premise is that insanity was traditionally tied to a lack of mens rea, and you say you agree with that, right? It was tied to common law intent. If we use the term mens rea, but it was tied to common law intent is a very different term than what they used, Justice Alito. Well, I'll quote you. The State's premise is that insanity was traditionally tied to a lack of mens rea, true, but mens rea historically required precisely the moral blameworthiness that Kansas law now excludes. So that's your historical position. That's half of our history. And how do you reconcile that with the fact that mens rea does not vary from crime to crime? So if that was the understanding of mens rea, that would apply in every case, and there would have to be moral blameworthiness in every case, not just those where the lack of blameworthiness is attributable to mental, to a mental disorder, however that is defined. If I'm understanding your question, Justice Alito, yes, mens rea, but mens rea historically or common law intent always contained this moral component. Then it would apply all across the board. It would, with the exception of perhaps the liability. It would apply to the person who said I assassinated this political leader because he's an evil person and he's going to do evil things. No, Justice Alito, because the only people that this has traditionally been applied to are the insane and maybe infants. And that's what you're arguing for, a separate insanity defense. And that was McNaughton. But that's inconsistent with the historical record as you yourself understand it, which is that it was tied to mens rea, which is categorical, applies in every single case. What is wrong with that? Our position is that to the extent it was tied to mens rea, inherent in the notion of mens rea was the ability to choose between right and wrong. So that is very different. That is very different than what Kansas has today, which has no inquiry into that. I mean, these 18th century cases that talk about moral capability or lack thereof and mens rea in the same breath are hard to understand, but you have to take into account. May I finish my sentence? Certainly, Mr. Chief Justice. That you have to take into account that people at the 18th century and early 19th century understanding of how the human mind works was very different from what we have today. There wasn't even any such thing as psychiatry in 1791, and it was in its infancy in 1868. Is that wrong? Mr. Chief Justice, I want to answer this succinctly. It's not about what mental illness was or wasn't. It's about how we treated insane people, this narrow group of them. I think everybody knows who they are when they are forced to decide it, and it's about not punishing people who don't know right from wrong. Thank you. Thank you, counsel. The case is submitted.